IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**TODD W. FARRELL,**                              Case No. 3:15 CV 1432

    Plaintiff,                              Judge Jack Zouhary

    v.                                            Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                              REPORT AND RECOMENDATION

## INTRODUCTION

Plaintiff Todd W. Farrell ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b). (Non-document entry dated July 21, 2015). For the reasons below, the undersigned recommends the Court affirm the Commissioner's decision denying benefits.

## PROCEDURAL BACKGROUND

Plaintiff filed an application for benefits in 2012, alleging disability as of October 15, 2011, due to epilepsy, depression, back problems, manic depressive/bipolar, neck problems, migraines, and seizures. (Tr. 112). The claims were denied initially and on reconsideration. (Tr. 126, 141, 144). Plaintiff, represented by counsel, and a vocational expert ("VE") testified at an administrative hearing on January 24, 2014. (Tr. 36-111). Following the hearing, an administrative law judge ("ALJ") issued an unfavorable decision finding Plaintiff not disabled.

(Tr. 12-29). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-4). Plaintiff filed the instant action on July 20, 2015. (Doc. 1).

<strong>FACTUAL BACKGROUND</strong>

<u>**Personal and Vocational Background**</u>

Plaintiff was born on January 22, 1966. (Tr. 293). He has a twelfth grade education, past military service, and past work experience as an electrician, bowling alley manager, and material handler. (Tr. 54, 352).

<u>**Relevant Medical Evidence**</u>

***Physical Impairments***

In September 2011, cervical spine x-rays revealed status post anterior fusion at C5-C7 with normal alignment, mild loss of disc space height at the C4-C5 level, and mild neural foraminal encroachment at the C5-C6 level on the left. (Tr. 400). Later that month, Plaintiff was treated for neck pain that radiated to his shoulder, but denied any paresthesia or weakness of the upper extremity; he requested additional pain medication because he had little relief. (Tr. 452). The record reveals that at a prior visit he received a Toradol injection. *Id.*

On October 27, 2011, social worker Richard Roth listed Plaintiff's diagnoses as bipolar disorder not otherwise specified in partial remission, post-traumatic stress disorder ("PTSD"), marijuana abuse in remission, cocaine abuse in remission, nicotine dependence, and rule out marijuana abuse in partial remission. (Tr. 419). Plaintiff received a global assessment of functioning ("GAF") score of 64.[1] *Id.*

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 64 indicates

2

Plaintiff sought treatment for neck pain and right arm numbness in November 2011. (Tr. 435). He had a full range of motion in his right arm. *Id.* The record reveals Plaintiff's migraines were stable with medication. *Id.* He also had well-controlled hyperlipidemia and was advised to continue medication and mental health follow-up treatment for manic-depressive disorder. *Id.* Plaintiff reported walking for 30 plus minutes three times or more times a week, and rated his pain a four out of ten. (Tr. 436).

In late April 2012, Plaintiff saw resident physician Gary Gallagher and Dr. Parent, due to headaches and spells. (Tr. 659-61). He reported feelings of "déjà vu" and a "feeling as if his head [was] in the cloud" followed by straightening and jerking in his right arm lasting for five to twenty minutes with unresponsiveness. (Tr. 659). During these "spells" he occasionally experienced stiffening and generalized cramping. *Id.* Plaintiff stated in the past the spells had occurred as frequently as four to six times a day, but had decreased to three times a week on average. *Id.* He also reported headaches three or four times a week. *Id.* The doctors assessed Plaintiff with "spells (complex partial sz vs. non-epileptic)" and migraine headaches. (Tr. 661). They noted that "[g]iven the driving restriction and inability to perform work tasks safely, we would support a decision to pursue temporary disability while awaiting further evaluation of spells". *Id.* The doctors increased Plaintiff's medication for headaches, mood stabilization, and "possible seizures." *Id.*

---

"[s]ome mild symptoms (e.g., depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning, (e.g., occasional truancy or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships." However, Plaintiff correctly points out that in the newest edition of the book, the GAF scale is no longer used as a diagnostic tool for assessing a patient's functioning because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *DSM-V-TR* at 16.

Plaintiff cancelled an appointment in June 2012, for overnight seizure monitoring because increased medication had improved his symptoms. (Tr. 1137). The following month, x-rays of the lumbosacral spine showed no spondylolisthesis, but did reveal loss of the normal lumbar lordosis, moderate degenerative disc disease at L3-L4 and L4-L5, and early posterior facet degenerative changes. (Tr. 879).

At an appointment in December 2012, Plaintiff's neck pain and right arm numbness were well-controlled with medication and his chronic obstructive pulmonary disease ("COPD") and migraines were stable with medication. (Tr. 1147). He reported walking 30 plus minutes three times or more a week and rated his pain as a three on a ten-point scale. (Tr. 1149).

In January 2013, Plaintiff had a routine follow-up appointment with Dr. Michael Mei-Hwa Wang for continued spells about once a week followed by a severe headache. (Tr. 1137). Plaintiff reported the spells had decreased from two to three times per week to about once per week. *Id.* At this time, he was the primary caregiver for his father. (Tr. 1139). The following month, Plaintiff reported that a medication increase resulted in a decrease in the frequency of his seizures from two to three times a week to one every two weeks. (Tr. 1106).

Pelvic x-rays, taken in June 2013, revealed moderate to severe left and mild to moderate right hip joint osteoarthritis and moderate lower lumbar spine degenerative disc disease. (Tr. 1236).

At a physical therapy appointment the following month, Plaintiff reported he could walk approximately a quarter mile and stand for a maximum of five minutes. (Tr. 1199). He installed a ramp at his home due to difficulty climbing stairs and sometimes used a cane. *Id.* Plaintiff was unable to push a lawn mower and had difficulty sleeping due to pain. *Id.* He reported his pain was a four out of ten with medication and noted sitting was "a comfortable position." *Id.* Plaintiff

4

had a significantly flexed trunk, decreased lumbar lordosis, fair balance without an assistive device, and antalgic gait with a decreased stance on the left. (Tr. 1200). A physical examination revealed limitation in his range of motion and strength. *Id.* He was unable to perform a straight leg raise on the left and had 75° on the right. (Tr. 1201). Plaintiff had a positive Faber's test and a positive Grind test. *Id.* He was issued a TENS unit and prescribed four physical therapy sessions. (Tr. 1201-02).

In November 2013, Plaintiff was treated in the emergency room for arthritic hip pain. (Tr. 1219-22). Hip x-rays showed bilateral osteoarthritis, severe on the left, with complete loss of the superolateral left hip joint space and enlarged osteophytes on the left femoral head. (Tr. 1222, 1340). He was treated with prescription medication and an injection for pain. (Tr. 1221-22).

### Mental Impairments

Plaintiff saw psychiatrist Howard Shapiro, M.D., about two or three times per year from 2010 to 2012. (Tr. 464-66, 477, 494, 516-17, 892, 977, 984-87, 1150-51). He also saw a social worker on some occasions. (Tr. 411-19, 476-77, 492-93, 981-83).

In August 2010, Plaintiff had an appointment with social worker Leslie Berk and reported, among other problems, difficulty sleeping, depression, flashbacks, and hypervigilance. (Tr. 492-93). He reported he was actively looking for employment and noted he was working fifteen hours a week performing contracting jobs with his father. (Tr. 492). Plaintiff had a more stable mood, productive daily routine, adequate energy, and good appetite. *Id.* He was coherent, polite, attentive, and neatly dressed, but had a slightly dysphoric mood and reactive affect that was appropriate in range. (Tr. 493). Ms. Berk assigned Plaintiff a GAF score of 55.[2] *Id.*

---

2. A GAF score of 55 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers). *DSM-IV-TR* at 34.

At an appointment in March 2010, Ms. Berk noted Plaintiff's slightly anxious mood and reactive affect and assigned him a GAF score of 58.[3] (Tr. 475-77). Plaintiff reported productive daily activities, including spending time with a close friend, helping to care for his father's dog, and watching television. (Tr. 476). He noted his appropriate mood, appetite, energy and sleep; he denied problems with concentration or motivation. *Id.* He reported helping his father with chores and performing odd jobs, including working fifteen hours a week for his father. *Id.* He reported his symptoms had decreased 50% since seeking mental health treatment. *Id.*

In June 2011, Plaintiff reported increased anxiety and insomnia after starting a job involving some driving. (Tr. 463). He was neatly dressed with good eye contact, clear speech, coherent thought process, pleasant affect, and no suicidal thoughts. *Id.* Dr. Shapiro assessed a GAF score of 50.[4] (Tr. 464).

Treatment notes from a social worker in October 2011 revealed Plaintiff's bipolar disorder was stable with medication for the previous one and a half years, although he had some fluctuating anxiety. (Tr. 411-13). Plaintiff had a euthymic mood and slightly elevated affect, but normal thought process and speech. *Id.* At that time, he reported he enjoyed swimming, softball, listening to music, religious activities, and meditation. (Tr. 416). The social worker assigned a GAF score of 64.[5] (Tr. 419).

In November 2011, Plaintiff reported to Dr. Shapiro he was jittery and had intermittent depression. (Tr. 440). He reported he was laid-off from a job after two months. *Id.* At the

---

3. A GAF score of 58 indicates moderate symptoms. *See DSM-IV-TR*, *supra* note 2.
4. A GAF score of 50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.)" *DSM-IV-TR* at 34.
5. *DSM-IV-TR*, *supra* note 1.

appointment, he had good eye contact, with a pleasant and reactive affect. *Id.* A few months later, in February 2012, Plaintiff reported he was doing well and felt a lot happier. (Tr. 431).

Plaintiff had an appointment with Dr. Shapiro in September 2012 and reported generally unchanged symptoms. (Tr. 892). He again complained of chronic severe insomnia, panic attacks two or three times a month, and chronic intrusive memories of childhood abuse. *Id.* Plaintiff reported increased medication had reduced frequency of his spells. *Id.* Dr. Shapiro noted he was neatly dressed with good eye contact, clear speech, coherent thought process, no suicidal thoughts, and an anxious affect but some appropriate smiling and reactivity. *Id.*

At an appointment with Dr. Shapiro in December 2012, Plaintiff was "doing pretty good" from a psychiatric perspective and had a stable mood without significant recurrence of depressive symptoms. (Tr. 1150-51). His symptoms of chronic panic attacks two or three times a month, generalized anxiety, and intrusive memories of abuse continued, but were manageable. (Tr. 1150). His father required more care, so he was not planning on relocating. *Id.*

**Opinion Evidence**

***Dr. Shapiro's First Opinion***

On September 11, 2012, Dr. Shapiro completed a Psychiatric/Psychological Impairment Questionnaire. (Tr. 1091-96). Dr. Shapiro noted he treated Plaintiff two to four times a year since January 2010 for PTSD. (Tr. 1091). He assigned a GAF score of 50[6] and noted Plaintiff's prognosis was "guarded for any further improvement". *Id.* Dr. Shapiro noted Plaintiff had a sleep disturbance, mood disturbance, recurrent panic attacks, intrusive recollections of a traumatic experience, generalized persistent anxiety, and suicidal ideation or attempts. (Tr. 1092).

---

6. *DSM-IV-TR*, *supra* note 4.

Dr. Shapiro noted Plaintiff had no evidence of limitation in his ability to remember locations and work-like procedures; understand and remember one or two step instructions; carry out simple one or two-step instructions; make simple work related decisions; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; and travel to unfamiliar places or use public transportation. (Tr. 1093-95).

He opined Plaintiff had mild limitation in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; sustain ordinary routine without supervision; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; and set realistic goals or make plans independently. *Id.*

Dr. Shapiro determined Plaintiff had moderate limitation in his ability to understand and remember detailed instructions; carry out detailed instructions; work in coordination with or proximity to others without being distracted by them; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. *Id.*

Finally, he believed Plaintiff was markedly limited in his ability to maintain attention and concentration for extended periods; and complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.*

Dr. Shapiro also noted Plaintiff experienced episodes of deterioration or decompensation in work or work like settings which caused him to withdraw from that situation and/or experience exacerbation of symptoms; he noted Plaintiff had a severe episode resulting in suicide

8

attempts and hospitalizations in 2006. (Tr. 1095). He noted Plaintiff had no side effects from any medications, but would likely be absent from work more than three times a month. (Tr. 1095-96).

### Dr. Shapiro's Second Opinion

On December 3, 2013, Dr. Shapiro completed a second Psychiatric/Psychological Impairment Questionnaire. (Tr. 1224-31). He stated he saw Plaintiff one to three times a year for PTSD, and assigned him a GAF score of 50.[7] (Tr. 1224). Dr. Shapiro noted Plaintiff's prognosis was "good for stability, but poor for further improvement". *Id.* He noted Plaintiff's primary symptoms were generalized anxiety, insomnia, panic attacks, and intrusive memories of abuse. (Tr. 1226). He noted Plaintiff had been hospitalized twice in Tennessee—once for a suicide attempt in 2005 and once for "depression" in 2008. *Id.* His clinical findings included sleep disturbance, mood disturbance, emotional lability, recurrent panic attacks, psychomotor agitation or retardation, difficulty thinking or concentrating, and generalized persistent anxiety. (Tr. 1225).

In this opinion, Dr. Shapiro opined Plaintiff now showed mild limitations, rather than no evidence of limitation, in his ability to remember locations and work-like procedures; understand and remember one or two-step instructions; and accept instructions and respond appropriately to criticism from supervisors. (Tr. 1227-28). Further, he determined Plaintiff was now markedly limited, rather than moderately limited, in his ability to work in coordination with or proximity to others without being distracted by them; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. *Id.* Finally, Dr. Shapiro noted Plaintiff's mild limitation in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, had improved;

---

7. *DSM-IV-TR*, *supra* note 4.

Plaintiff now showed no evidence of limitation in this category. (Tr. 1228). In the remaining residual functional capacity categories, Dr. Shapiro's opinion remained the same as in his first opinion. (Tr. 1227-29).

Dr. Shapiro again noted Plaintiff had no side effects from any prescription medication. (Tr. 1229). He stated Plaintiff was not a malingerer and his anxiety exacerbated his joint pain. (Tr. 1230). Based on descriptions of previous attempts, Dr. Shapiro determined Plaintiff was capable of tolerating low stress. *Id.* Dr. Shapiro determined Plaintiff's symptoms would last twelve months and he was "totally disabled". (Tr. 1223, 1230). He noted Plaintiff had these symptoms and limitations since January 12, 2010. (Tr. 1231).

***Consultative Examiner***

On April 27, 2012, Dore R. Shafransky, D.O., examined Plaintiff at the request of the Social Security Administration. (Tr. 736-40). Plaintiff's ability to walk was unimpaired; he walked with a normal gait, without the use of an assistive device. (Tr. 737). He also had no difficulty getting on and off the examination table, no difficulty heel and toe walking, and severe difficulty squatting. *Id.*[8]

In regard to Plaintiff's seizures, Dr. Shafransky determined he would not be able to work due to his impaired ability to function on a daily basis and would potentially constitute a threat to his and others safety if he were to work in an industrial setting. (Tr. 739). Dr. Shafransky also determined Plaintiff's degenerative disease was a severe medical impairment because it caused him to take frequent breaks when doing simple tasks. *Id.* She noted Plaintiff's COPD was symptomatic, but even with an inhaler, as long as Plaintiff continued to smoke he would not have

---

8. Dr. Shafransky also noted Plaintiff had a decreased range of motion of the cervical spine; however, this finding was the result of a dictation error and was later corrected to state Plaintiff had a normal range of motion of the cervical spine. (Tr. 737, 746).

asymptomatic improvement in his shortness of breath. *Id.* Plaintiff stated he could sit for one hour, stand for fifteen minutes, and walk for fifteen minutes. *Id.* Plaintiff performed his own household chores, did not drive due to seizures, and maintained his own personal hygiene without assistance. *Id.* Dr. Shafransky concluded that Plaintiff was disabled and unable to participate in even sedentary work. (Tr. 739-40).

### State Agency Reviewers

#### Physical Impairments

On May 31, 2012, William Bolz, M.D., determined Plaintiff could lift twenty pounds occasionally and ten pounds frequently; stand, walk, or sit for about six hours in an eight-hour workday; occasionally climb ramps/stairs; never climb ladders/ropes/scaffolds; frequently balance; and had no limitations in regard to stooping, kneeling, crouching, and crawling. (Tr. 120-21). Dr. Bolz noted Plaintiff should avoid concentrated exposure to extreme heat, humidity, fumes, odors, dusts, gases, poor ventilation, and avoid all exposure to hazards due to seizures. (Tr. 121).

A second state agency reviewer mostly affirmed this opinion with the exception of a finding that Plaintiff could have unlimited exposure to extreme heat and humidity. (Tr. 135-38).

#### Mental Impairments

On April 12, 2012, state agency reviewing psychologist Paul Tangeman, Ph.D., opined Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and respond appropriately to changes in the work setting. (Tr. 122-23). Dr. Tangeman noted Plaintiff would be able to complete moderately complex tasks

involving three or four steps per task, and would benefit from a moderately static workplace. (Tr. 123). He added Plaintiff got along well with others, had a coherent thought process, did not handle stress or change in routine well, was stable on medication for the past one and a half years, and seemed to have his mental health condition stabilized. (Tr. 124).

In August 2012, a second reviewing psychologist affirmed Dr. Tangeman's opinion. (Tr. 138-39).

## **Hearing Testimony**

Plaintiff testified that two and a half years earlier he helped a family member with odd jobs and lawn care of apartment complexes. (Tr. 48). He also assisted his ailing father. (Tr. 48-49). His father drove him to the hearing because he alleged he was not allowed to drive due to his seizure disorder. (Tr. 52-53). However, he admitted he possessed a regular driver's license with no restrictions, but opted not to drive. *Id.* Plaintiff stated he was able to walk to the corner and back, but was limited by his hip problems. (Tr. 53-54). He assisted his elderly neighbor by "try[ing] to help her roll her cans out to the curb", but was unable to push a lawn mower. (Tr. 64). He received a medical discharge from the Navy due to his seizure disorder and was diagnosed with "complex partial epilepsy." (Tr. 56-58). Plaintiff stated he was no longer able to bowl and had been unable to do so since a neck fusion in 2004. (Tr. 61). He testified that a year and a half prior he had been placed on temporary disability by a neurologist. (Tr. 63).

Plaintiff admitted he had suffered from the seizure disorder for twenty years, but was only recently prevented from working because he was no longer able to "feel the seizures coming on". (Tr. 66). He took prescription medication for seizures and migraines. (Tr. 70). Since starting the medication his seizures were reduced from four or five a week to two a week. *Id.* He

also took prescription medication for treatment of his manic depression, which helped control the condition. (Tr. 72-74). He also reported his COPD was well-controlled with an inhaler. (Tr. 76).

Plaintiff testified he would soon be starting pain management for his left hip pain because physical therapy was unsuccessful. *Id.* He had been having difficulty with his left hip for approximately eight months. (Tr. 77). Plaintiff used a TENS machine, but it did not alleviate the pain. (Tr. 78). He went to the emergency room in November 2014 for problems with his left hip. *Id.* Plaintiff also addressed his degenerative spine disorder, which caused him pain, aches, and the inability to lift or carry heavy weight. (Tr. 79). He estimated he could lift fifteen pounds with one hand and twenty pounds with both hands. (Tr. 79-80). He also experienced pain in his hip and back. (Tr. 81, 92-93).

Plaintiff testified he was diagnosed with PTSD and associated panic attacks, for which he took medication. (Tr. 81). He experienced panic attacks ten times a month which were triggered by the "smell of certain colognes." (Tr. 81-82). When this happened he would shake, lose concentration, could not be around people, or function. (Tr. 82). The medication helped with "the shakes" and he was not receiving therapy. (Tr. 83).

Plaintiff was able to perform some household chores, but was unable to complete maintenance work on his home. (Tr. 84). He shopped for groceries with his father and tried to walk on a regular basis, but was only able to walk approximately 200 yards. (Tr. 85-86). Plaintiff had some difficulty performing personal hygiene tasks, including showering. (Tr. 88). He also reported difficulty sitting, climbing stairs, and sleeping; he slept every night in a recliner because he was unable to sleep lying flat. (Tr. 90-91). Plaintiff estimated he was able to sit or stand for fifteen minutes at a time. (Tr. 93).

13

A VE also testified at the hearing by telephone. (Tr. 98-109). The ALJ asked her whether the following hypothetical individual similarly situated to Plaintiff with the following limitations could perform any past work: lift twenty pounds occasionally and ten pounds frequently; stand, walk, and sit for six hours; occasionally use stairs and ramps, but never use ladders, ropes, or scaffolds; frequently balance; avoid extreme heat, conditions of high humidity, and concentrated exposure to respiratory irritants; avoid unprotected heights or moving machinery; could not perform commercial driving; able to perform moderately complex tasks involving three to four steps; make judgments on simple work; respond appropriately to usual work situations, but would need a static work environment with few unexpected changes; and could respond appropriately to supervision, the general public, and co-workers. (Tr. 98-99). The VE opined the individual could still perform Plaintiff's past work of bowling alley manager and other work in the national or local economy. (Tr. 99-100).

The second hypothetical question involved an individual who could lift thirty pounds occasionally and fifteen pounds frequently; stand and walk for two hours per day and sit for six; could not push/pull with the left lower extremity; could occasionally climb stairs and ramps; could not use ladders, ropes, or scaffolds; could occasionally balance; frequently stoop; occasionally kneel; could not crouch or crawl; and with the same environmental limitations as in the first hypothetical question. (Tr. 101). The VE opined this individual would be unable to perform Plaintiff's past work, but could perform other work. (Tr. 102-05).

**ALJ Decision**

On March 26, 2014, the ALJ made the following findings of fact and conclusion of law:

1. Plaintiff met the insured status requirements of the Social Security Act through December 31, 2014.

14

2.  Plaintiff had not engaged in substantial gainful activity since October 15,
    2011, the alleged onset date.

3.  Plaintiff had the following severe impairments: seizures with postictal
    headaches; degenerative disc disease at L3-4 and L4-5; bilateral hip
    osteoarthritis; cervical neck pain, *status post* anterior fusion; post-traumatic
    stress disorder with anxiety; and a history of a bipolar disorder.

4.  Plaintiff did not have an impairment or combination of impairments that met
    or medically equaled the severity of one of the listed impairments in 20 C.F.R.
    Part 404, Subpart P, Appendix 1.

5.  Plaintiff had the residual functional capacity to perform light work as defined
    in 20 C.F.R. 404.1567(b) and 416.967(b) except that he could lift 30 pounds
    occasionally and 15 pounds frequently; could stand and walk two hours per
    day; could not push or pull with the left lower extremity; could occasionally
    use stairs and ramps; could never use ladders, ropes, or scaffolds; could
    occasionally balance; could frequently stoop; could occasionally kneel; could
    not crouch or crawl; must avoid extreme heat, conditions of high humidity,
    and concentrated exposure to respiratory irritants; could not work around
    unprotected heights or moving machinery; could not perform commercial
    driving; could perform moderately complex tasks involving three to four
    steps; could make judgments on simple work; could respond appropriately to
    usual work situations, but needed a static work environment with few and
    expected changes; and could respond appropriately to supervision, the general
    public and coworkers.

(Tr. 12-29).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the

Commissioner's conclusions absent a determination that the Commissioner has failed to apply

the correct legal standards or has made findings of fact unsupported by substantial evidence in

the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial

evidence is more than a scintilla of evidence but less than a preponderance and is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y*

*of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings

"as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r*

*of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for disability benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's RFC and can claimant perform past relevant work?

5. Can claimant do any other work considering his RFC, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience

16

to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff alleges the ALJ erred (1) in his residual functional capacity determination by failing to properly weigh the medical evidence, and (2) by failing to properly evaluate Plaintiff's credibility.

**Evaluation of the Medical Record and RFC Determination**

A claimant's residual functional capacity ("RFC") is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence *Id.* § 416.929. While an ALJ must consider and weigh medical opinions, the RFC determination is expressly reserved to the Commissioner. *Ford v. Comm'r of Soc. Sec.*, 114 F. App'x 194, 198 (6th Cir. 2004); 20 C.F.R.§§ 404.1527(e)(2), 404.1546, 416.927, and 416.945(a)(1).

*ALJ's Evaluation of Opinion Evidence*

Plaintiff first asserts the ALJ violated the treating physician rule by assigning "little weight" to Dr. Shapiro's opinions and "very little weight" to the consultative examiner's opinion, and instead assigned "great weight" to the opinions from non-examining state agency psychologists. (Doc. 10, at 15).

Under the regulations, there exists a hierarchy of medical opinions: first, is a treating source whose opinion is entitled to deference because it is based on an ongoing treatment relationship; second, is a non-treating source, which are those medical sources who have

17

examined but not treated the Plaintiff; and lastly, is a non-examining source, those who render opinions based on a review of the medical record as a whole. 20 C.F.R. § 416.902.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to

the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.*

Non-examining sources are physicians, psychologists, or other acceptable medical sources that have not examined the claimant, but review medical evidence and provide an opinion. § 416.902. The ALJ will consider the findings of these non-examining sources as opinion evidence, except as to the ultimate determination about whether Plaintiff is disabled. § 416.927. "[T]he opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight." *Douglas v. Comm'r of Soc. Sec.*, 832 F.Supp. 2d 813, 823-24 (S.D. Ohio 2011). This is because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." *Id.*; § 416.927(c), (d); SSR 96–6p, 1996 WL 374180, at *2–3. "Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization." *Douglas,* 832 F.Supp. 2d at 823-24.

*Dr. Shapiro's Opinions Regarding Plaintiff's Mental Limitations*

Here, Dr. Shapiro is presumptively a treating physician, as no party asserts otherwise and it appears from the record he regularly, although infrequently, treated Plaintiff. The ALJ assigned Dr. Shapiro's opinions less than controlling weight; therefore, the issue is whether she provided

"good reasons" for doing so. In the section of her opinion in which she specifically discussed Dr. Shapiro's opinions, the ALJ stated:

> The numerous opinions given by Dr. Shapiro have been fully considered, but they are only given some weight. While the records from the Veterans Administration Clinic indicate that the claimant has severe mental impairments, including post-traumatic stress disorder and a history of bipolar disorder, he is capable of completing more than three to four step[] tasks, making judgments on complex work, and dealing with frequent change, and retains the ability to respond appropriately to usual work situations, supervision, the general public and coworkers.  As such, the opinions of Dr. Shapiro that indicate that the claimant is disabled or that he has marked mental limitations are given little weight. Finally, it is important to note that the U.S. Court of Appeals for the Sixth Circuit has indicated that a GAF of 50 is consistent with the ability to work (*Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007)).

Plaintiff argues the reasoning the ALJ provided for assigning less than controlling weight to the opinion of Dr. Shapiro is insufficient. He asserts the ALJ failed to specify how the opinions conflict with the treatment notes and failed to identify substantial evidence contradicting the opinions. (Doc. 10, at 17).

An ALJ's reasoning concerning a treating physician's opinion weight may be brief, but a single statement asserting inconsistency, without more, is not sufficient to make clear the reasons why the treating physician is accorded little weight. *See Allen v. Comm'r of Soc. Sec.,* 561 F.3d 646, 651 (6th Cir. 2009); *Friend v. Comm'r of Soc. Sec.* 375 F. App'x 543, 551-52 (6th Cir. 2010). However, while an ALJ is required to delineate good reasons, she is not required to enter into an "exhaustive factor-by-factor analysis." *Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011).

Here, the ALJ did not simply state the opinion was inconsistent with the record, but rather that it was inconsistent because while it showed Plaintiff had severe mental impairments, it also revealed he was still able to complete more than three to four step tasks, make judgments

on complex work, deal with frequent change, and retain the ability to respond appropriately to usual work situations, supervision, the general public and coworkers. (Tr. 26).

Plaintiff asserts the "only medical evidence inconsistent with Dr. Shapiro's opinions on [Plaintiff's] mental limitations is those from the non-examining state agency medical sources" and "[t]he ALJ also failed to identify any substantial evidence contradicting [Dr. Shapiro's opinions]. (Doc. 10, at 18, 19). This is simply not the case.

First, the ALJ was not required to adopt Dr. Shapiro's opinion that Plaintiff is disabled. *See Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 727 (6th Cir. 2014) ("A doctor's conclusion that a patient is disabled from all work may be considered as well, but could 'never be entitled to controlling weight or given special significant' because it may invade the ultimate disability issue reserved to the Commissioner.")

Second, in her RFC determination, the ALJ did incorporate some of Dr. Shapiro's limitations in determining Plaintiff needed a static work environment with few and expected changes. (Tr. 21).

Third, throughout her opinion the ALJ addressed Plaintiff's mental impairments and the inconsistencies in the record, providing sufficient "good reasons" for providing less than controlling weight to portions of Dr. Shapiro's opinions. She noted the medical records from the Veterans Administration supported the ALJ's mental RFC finding rather than Dr. Shapiro's. (Tr. 26). Indeed, Plaintiff often reported his psychiatric symptoms were stable or improving with medication and Dr. Shapiro noted many normal mental status findings. (Tr. 25, 431, 892, 1150, 1148, 1224). The ALJ pointed out that at an appointment on September 11, 2012—the same day he penned his first opinion—Dr. Shapiro noted Plaintiff was "generally stable functioning" and had "no significant mood impairment". (Tr. 25, 892). Dr. Shapiro also noted Plaintiff was neatly

dressed, with good eye contact, clear speech, coherent thought process, some appropriate smiling and reactivity, and no suicidal thought. (Tr. 892). At an appointment on December 11, 2012, Dr. Shapiro again noted Plaintiff was neatly dressed, with good eye contact, clear speech, coherent thought process, bright affect, and no suicidal thoughts. (Tr. 1150). At this appointment Plaintiff reported he was doing well with a stable mood, manageable symptoms, improved sleep, and better concentration during the day. *Id.* The ALJ noted that at an appointment in February 2012 Plaintiff reported he was doing better and was much happier. (Tr. 25, 431). Further, there seem to be no abnormal mental status findings in the record after December 2012, and in a June 2013 phone call with Dr. Shapiro Plaintiff stated he was getting along better with his wife and they were communicating better than ever. (Tr. 25, 1204). The ALJ noted the lack of episodes of decompensation with loss of adaptive functioning requiring increased treatment or placement in a less stressful situation. (Tr. 20). Thus, the ALJ properly addressed the lack of supportability and inconsistency between the record and portions of Dr. Shapiro's opinions. *See* 20 C.F.R. §§ 404.1527(c)(3), (c)(4); 416.927(c)(3), (c)(4).

Plaintiff also argues it was improper for the ALJ to assign more weight to the state agency reviewers' opinions than Dr. Shapiro because they reviewed a deficient record, devoid of Dr. Shapiro's opinions. (Doc. 10, at 18-19). However, there is "no categorical requirement that [a] non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record." *Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1002 (6th Cir. 2011) (quoting SSR 96-6p).

Also, GAF scores are not determinative of disability and the case to which the ALJ cited, *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007), does not find otherwise. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009). *Smith* does suggest a GAF score of 50

22

is consistent with an ability to "hold at least some jobs in the national economy", but that notion is, again, not determinative. *Smith*, 482 F.3d at 877. Here, the ALJ did not assert she found Plaintiff not disabled solely because of a GAF score of 50. Any argument Plaintiff makes to this effect is not well-taken.

Furthermore, if Dr. Shapiro's limitations were based on Plaintiff's subjective complaints, the ALJ noted inconsistencies between his testimony and the record, rendering him not entirely credible. *See Lunsford v. Astrue*, 2012 U.S. Dist. LEXIS 52792, *13-14 (S.D. Ohio), *adopted by Lunsford v. Comm'r of Soc. Sec.*, 2012 U.S. Dist. LEXIS 87690 (finding that "if an ALJ finds…subjective reports to be unworthy of complete belief, any medical opinion based on such complaints may be also be discounted."). Plaintiff challenges this credibility determination, which is discussed below.

The ALJ directly cited and addressed Dr. Shapiro's opinions and provided sufficient reasons for according portions of it less than controlling weight. Throughout her opinion she addressed factors of supportability of the opinion and consistency of the opinion with the record as a whole. The ALJ did not violate the treating physician rule and adequately addressed the opinion evidence.

*Dr. Shafransky's Opinion Regarding Plaintiff's Physical Limitations*

Plaintiff next argues the ALJ erred by assigning "very little weight" to the opinion of consultative examiner Dr. Shafransky and by rejecting his opinion that Plaintiff was disabled. (Doc. 10, at 15-16, 20-22). In fact, the ALJ assigned varying degrees of weight to Dr. Shafransky's opinion.

The ALJ first discussed the Dr. Shafranksy's findings during a physical examination and concluded "[d]espite these rather benign clinical findings Dr. Shafransky opined that, due to the

claimant's seizures, he would not be able to go back to his prior work or go into any new work since this condition impairs his ability to function on a daily basis." (Tr. 26). The ALJ assigned this opinion "some weight because the record as a whole supports a finding that the claimant cannot engage in his past relevant work which involved medium to heavy exertion." (Tr. 26-27). The ALJ accounted for this in her RFC determination by limiting Plaintiff to light work with additional limitations. (Tr. 20-21). She also noted additional reasons touching on the factors of consistency and supportability to partially discount Dr. Shafransky's opinion including the reduction in frequency of seizures and the fact that a clinical examination did not reveal neurological or other abnormalities related to an observed seizure. (Tr. 24, 26, 736-40, 739, 1051, 1112, 1125).

The ALJ next addressed Dr. Shafransky's opinion that Plaintiff's sacroiliac pain appeared to be somewhat incapacitating because he had to take frequent breaks when performing simple tasks. (Tr. 27). The ALJ assigned this opinion "some weight" because clinical findings and objective tests showed some physical limitation due to lumbar and bilateral hip osteoarthritis, but his testimony suggested he did not require more than regular work breaks. *Id.* Indeed, and as the ALJ discussed, Plaintiff had no difficulty maneuvering or walking during the examination, had a full range of motion of his spine and extremities, and had full muscle strength. (Tr. 26, 737, 739, 741-43, 746). This touches on the consistency factor and supportability of Dr. Shafransky's opinion, and even so, the ALJ accounted for this pain in her RFC determination by limiting Plaintiff to standing and walking for two hours and lifting and carrying only 30 pounds occasionally and 15 pounds frequently. (Tr. 20-21).

The ALJ addressed Dr. Shafranky's opinion that Plaintiff's COPD would preclude him from performing prolonged walking because Plaintiff stated he had trouble breathing after fifteen

24

minutes and had to pace himself if walking a half mile. (Tr. 27). The ALJ gave that opinion "significant weight" because Plaintiff's COPD was exacerbated when he was smoking. *Id.* The ALJ accounted for this in her RFC finding by limiting Plaintiff's exposure to respiratory irritants, including smoke  and limited him to no more than two hours or walking and standing a day. (Tr. 21, 27). However, the ALJ also noted Plaintiff's COPD was controlled with medication, a fact Plaintiff admitted at the hearing. (Tr. 18, 27, 76). Plaintiff also testified he reduced the number of cigarettes he smoked on a daily basis. (Tr. 22, 89, 736).

The ALJ gave Dr. Shafransky's opinion that Plaintiff was disabled and not able to participate in even sedentary work "very little weight because it is inconsistent with [Plaintiff's] robust activities of daily living, the relatively benign clinical findings, the medical record as a whole and the determination of 'disability' resides with the Commissioner". (Tr. 27). It is correct that the ultimate determination of disability rests with the Commissioner. *See Kidd v. Comm'r of Soc. Sec.*, 283 F. App'x 336, 340 (6th Cir. 2008) ("It is well-settled that the ultimate issue of disability is reserved to the Commissioner."). Plaintiff argues that just because this is so, it does not provide an independent reason for rejecting valid medical opinions. (Doc. 10, at 20-21).

However, the ALJ provided sufficient reasons for discounting this opinion throughout her opinion which addressed the required factors, including Dr. Shafransky's benign clinical findings and Plaintiff's activities of daily living. The ALJ noted Dr. Shafranksy examination findings including: normal range of motion of the neck without stiffness; normal range of motion in the cervical spine; normal lung function; unremarkable exam of the heart, head, and abdomen; no clubbing or cyanosis in the fingertips; no difficulty getting on and off the examination table; and no difficulty heel-toe walking. (Tr. 26, 746, 737). Further, Plaintiff could pick up a coin, secure buttons, and open a door; had no neurologic deficits; equal and symmetrical hand grasp; intact

motor and sensory function; and normal gait without the use of an assistive device. (Tr. 26, 737). The ALJ noted Plaintiff's ability complete household tasks, prepare meals, perform personal care activities, and act as the primary caregiver for his ailing father. (Tr. 19, 22, 27, 48-49, 319-20). Plaintiff regularly walked for 30 minutes, shopped, read, helped relatives with physical tasks, and attended church. (Tr. 19, 22, 87, 321, 322, 416). At the hearing Plaintiff testified his daily activities consisted of "regular, normal activities". (Tr. 94).

Therefore, Dr. Shafranksy's extreme limitations were not consistent with the record or even his own findings and the ALJ properly addressed these inconsistencies in assigning "very little weight" to his opinion that Plaintiff was disabled and incapable of performing even sedentary work. An ALJ is not required to blindly adopt the opinion of a consultative examiner finding a plaintiff disabled. Here, the ALJ appropriately described reasons, relating to the required factors, for her assignment of weight to various portions of Dr. Shafransky's opinion.

**Credibility Assessment**

Plaintiff also challenges the ALJ's credibility assessment. (Doc. 10, 23-26). Mental impairments are often difficult to quantify with objective medical evidence, so an ALJ must look to a plaintiff's credibility. When making a credibility finding, the ALJ must make a finding based on a consideration of the entire record. SSR 96-7p, 1996 WL 374186, *1. But, an ALJ is not bound to accept as credible Plaintiff's testimony regarding symptoms. *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 529 (6th Cir. 1992). Analysis of alleged disabling symptoms turns on credibility. *See Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 726-27 (6th Cir. 2004). "Because of their subjective characteristics and the absence of any reliable techniques for measurement, symptoms are difficult to prove, disprove, or quantify." SSR 82-58, 1982 WL 31378, *1. In evaluating credibility an ALJ considers certain factors:

26

(i) [A claimant's] daily activities;

(ii) The location, duration, frequency, and intensity of [a claimant's] pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or ha[s] taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, [a claimant] receive[s] or ha[s] received for relief of [Plaintiff's] pain or other symptoms;

(vi) Any measures [Plaintiff] use or ha[s] used to relieve [a claimant's] pain or other symptoms; and

(vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 416.929(c)(3).

Ultimately, it is for the ALJ, not the reviewing court, to judge the credibility of a claimant's statements. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (ALJ's credibility determination accorded "great weight"). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters,* 127 F.3d at 531. The Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported by substantial evidence in the record." *Jones,* 336 F.3d at 476. The Court may not "try the case de novo, nor resolve conflicts in evidence . . . " *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).

Here, the ALJ determined Plaintiff's statements and allegations lacked credibility because the medical record as a whole did not support the alleged limitations; prescribed medication was relatively effective in controlling his symptoms; the daily activities he described were not limited to the extent one would expect given his complaints; his ability to work with his

27

brother and father—which even though not performed at the level of substantial gainful activity—provided insight into his ongoing functionality; and his "generally unpersuasive appearance and demeanor while testifying at the hearing." (Tr. 22-23).

Plaintiff first briefly asserts the ALJ erred because she "failed to cite to any evidence that medications resulted in significant or sustained relief of all of his symptoms." (Doc. 10, at 23). Plaintiff does not cite to any Sixth Circuit case law to support the assertion the ALJ is required to cite to evidence showing significant or sustained relief from *all* symptoms in order for her to consider this evidence in her credibility assessment. Further, at the hearing Plaintiff testified he suffered from seizures twice a week; however, the record reveals he frequently reported decreases in the frequency of his seizures due to medication adjustments. (Tr. 24, 70, 659, 1051, 1106, 1112, 1137). As such, the ALJ properly determined Plaintiff's medications were "relatively effective" in controlling his symptoms as part of her credibility analysis. (Tr. 24, 435, 436, 441, 1051, 1112, 1137).

Plaintiff next argues that his ability to work part-time for family members and to perform some other simple activities of daily living fails to establish he has the physical or mental capacity to work full-time. (Doc. 10, at 24). In addition to being the primary caregiver for his ailing father, Plaintiff also walked regularly for 30 minutes, helped family members tend to their rental properties by mowing the lawn, and reported few problems with personal care activities and chores; this undermines his testimony he was only able to stand or walk 15 minutes at a time. (Tr. 86, 93, 736, 1139). Because of the inconsistency in the record, the ALJ properly considered this evidence in her assessment of the credibility factors. (Tr. 19, 23).

Plaintiff also argues the ALJ improperly relied on his appearance at the hearing in finding him not entirely credible. (Doc. 10, at 24). In making this assertion, Plaintiff cites to a case out of

the Eastern District of Michigan, which in-turn cites a Sixth Circuit case, *King v. Heckler*, 742 F.2d 968 (6th Cir. 1984). *King* does not support Plaintiff's argument. In *King*, the court stated that in cases in which the medical evidence is not entirely consistent, as is the case here, a credibility assessment by the ALJ is necessary. *King*, 742 F.2d at 975 n.2. The court further stated that regarding issues of pain, an ALJ "may not rely solely on the demeanor of the applicant as observed by the ALJ at the hearing" as a reason for denying benefits. *Id.*

Here, a credibility assessment was necessary because there were inconsistences in the record, and the ALJ's observations were not the sole basis for denying benefits, but rather a consideration when assessing the credibility factors. Additionally, the Sixth Circuit has held, "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *See, e.g., Walters*, 127 F.3d at 531.

Finally, the record reveals Plaintiff wished to discontinue physical therapy as he was moving out of the area and reported he was doing well and was compliant with exercises. (Tr. 24, 1198). Plaintiff asserts the ALJ "mischaracterized the record by suggesting [Plaintiff] stated he was stopping treatment *because* he was doing better". (Doc. 10, at 25) (emphasis added). However, the ALJ in fact stated Plaintiff "wanted to discontinue his treatment *and* that he was doing well and was compliant with his exercises". (Tr. 24) (emphasis added). This is an accurate recitation of the record. Even so, the fact that the ALJ left out that Plaintiff wanted to cancel remaining appointments because he was moving out of state is not dispositive of anything. Additionally, as the Commissioner points out, the record does not reveal he resumed physical therapy in another state. (Doc. 13, at 21).

Further, additional evidence in the record supports the conclusion that Plaintiff is not entirely credible because it conflicts with Plaintiff's testimony at the hearing. As the ALJ points out, the record reveals many normal findings of gait, reflexes, coordination, range of motion and strength. (Tr. 24, 660, 741-43, 773). Plaintiff testified he had trouble sitting and had to use a recliner, but the record reveals he had no pain while sitting. (Tr. 90-91, 1199). The ALJ also noted that while Dr. Shafransky opined Plaintiff was disabled based on Plaintiff's statements, the examination revealed relatively normal results. (Tr. 26, 737-39, 741-43). Notes from various psychiatric appointments reveal relatively normal results, including normal insight, judgment, denial of suicidal ideation, normal thought process, and normal mood. (Tr. 25, 413-14, 440, 892). Therefore, the undersigned finds the ALJ's credibility determination reasonable and supported by substantial evidence in the record.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision supported by substantial evidence and reached with the correct legal standards. The undersigned recommends the Court affirm the Commissioner's decision denying benefits.


s/James R. Knepp, II
United States Magistrate Judge


*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).